**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

LONNIE E. WILLIAMS                                                                               PLAINTIFF

v.                                                  No. 4:12CV00393 JLH

ASBURY AUTOMOTIVE GROUP, INC.;
and NP VKW LLC, d/b/a NORTH POINT
MAZDA/VOLKSWAGEN                                                                     DEFENDANTS

## <u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

This age discrimination case was tried to the Court and is now ripe for decision.  Lonnie E. Williams was employed on two different occasions as the service manager at the North Point Mazda/Volkswagen store in Sherwood, Arkansas.  His second stint abruptly ended at the end of April of 2011.  Williams says that he was fired because of his age.  The defendants deny that Williams was fired and deny that any adverse action was taken due to Williams's age.  They contend that Williams resigned after learning that the duties of the manager of the service department would be divided between him and another person.

Williams was born in June of 1947, so he was approaching sixty-four years of age when his employment at North Point Mazda/Volkswagen ended.  By that time, he had been in the parts and service portion of the automotive industry for more than forty years.  His career had included two stints with Volkswagen of Mid-America, and he was certified as a Volkswagen master technician.  He was the service manager at North Point Mazda when it opened in 1986 until he resigned in 2001.  Partly because of his connections with Volkswagen Mid-America, the North Point Mazda store acquired a Volkswagen franchise in 1996 and then became North Point Mazda/Volkswagen.

Although North Point Mazda/Volkswagen operates as a single dealership, it has separate buildings and separate showrooms for sales of Mazda vehicles, on the one hand, and Volkswagen

vehicles, on the other.  It has only one service building, however, for both brands.  The Volkswagen "service lane," where customers bring their automobiles for service, is a part of the building that houses the Volkswagen showroom.  The Mazda service lane, on the other hand, is part of the service building where all of the technicians, both those who work on Mazda vehicles and those who work on Volkswagen vehicles, work.

North Point Mazda/Volkswagen is owned and operated by a limited liability company, N.P. VKW LLC.  That entity is part of the Asbury Automotive Group.  The Asbury Automotive Group owns clusters of automobile dealerships in various cities across the United States.  Each cluster of dealerships is referred to as a "platform."  Asbury Automotive Group has several automobile dealerships in central Arkansas as part of their North Point platform.

Asbury Automotive Group, Inc., which is a defendant in this case, is a holding company; it has no employees.  Asbury Automotive Group, LLC, which is not a defendant in this case, is an operating entity that oversees the various Asbury Automotive Group platforms.  Asbury Automotive Group divides these platforms into regions for management purposes.  During the relevant period of 2011, the regional manager over the North Point platform was Gary Dodson, and the regional service manager was Domenick Colanero.

Wes Thomas was the general manager of North Point Mazda/Volkswagen from 2006 until April of 2011.  In March of 2010, his service manager, Dewayne Bell, resigned to take the same position with a newly-opened competitor, Owens-Murphy Volkswagen in Little Rock.  Thomas designated Bell as not eligible for rehire because Bell, while he was still employed at North Point Mazda/Volkswagen, recruited several of the North Point Mazda/Volkswagen employees to go with him to Owens-Murphy Volkswagen.  When Bell resigned, Thomas recruited Williams to return to

2

North Point Mazda/Volkswagen.  At that time, Williams was employed as the service manager at Gossett Volkswagen-Porsche-Audi in Memphis.  Williams accepted the offer and returned to North Point Mazda/Volkswagen as service manager on April 11, 2010.

On April 14, 2011, Thomas was transferred from the North Point Mazda/Volkswagen store to the North Point Toyota store, where he became general manager.  Gary Dodson promoted Jon Collins, who had been the sales manager at North Point Mazda/Volkswagen, to general manager of that store on that same date.

On April 17, 2011, Collins met with Bell at the North Point Mazda/Volkswagen store and offered him an opportunity to return to employment at that store.  According to both of them, Collins proposed that the duties of service manager be divided, with Bell becoming the Volkswagen service manager and Williams becoming the Mazda service manager.  On April 18, 2011, Bell filled out an application for employment at North Point Mazda/Volkswagen and stated that the position that he desired was "service manager-Mazda/Volkswagen."  Bell could not be employed until he passed a drug screen and a background check.  Favorable results on those two requirements were received on April 25, 2011.  Sometime during that time frame, Collins spoke with Thomas to clear Bell's ineligible-for-rehire designation, and Thomas agreed to the removal of that impediment to Bell being rehired.

Collins had his first conversation with Williams about Williams's employment status sometime during the week of April 25, 2011.  Collins is uncertain as to the date of the conversation.  Williams says it occurred on April 26, 2011.  The two of them disagree as to what was said during the conversation.

According to Williams, Collins said that he (Collins) was going to have to let him (Williams) go, attributing the termination decision to Dodson. Williams says that Collins asked him to stay through the end of the month and close the month, which he agreed to do because much of his income, and the income of the service advisors whom he supervised, depended on closing the repair orders and completing the warranty documentation.[1]

According to Collins, he told Williams that he was going to divide the service manager responsibilities into two positions, with Bell serving as the Volkswagen service manager and working at the Volkswagen service lane in the Volkswagen building, while Williams would be service manager for the Mazda brand, working at the Mazda service lane in the service building. Collins testified that the plan was for Bell to concentrate on customer relations, which was his strength, while Williams would work more directly with the technicians rather than with customers. Collins testified that the service department had been stagnant over a period of several years, and he thought having two service managers would increase the sales and profitability of the department. He also testified that the Mazda representative had requested a dedicated service manager for the Mazda brand. When presented with this proposal, according to Collins, Williams wanted more details as to how the

---

[1] The defendants contend that this testimony is not credible because a terminated employee is not allowed to stay on the premises and have continued access to company information. Williams concedes that that is the general practice but insists that an exception was made in this instance. Williams's testimony on this point is credible. It is apparent that Collins needed Williams to stay through the end of the month to close the books, as confirmed by the fact that Bell returned to Owens-Murphy to assist with payroll at the end of the first couple of months after he had already begun work at North Point Mazda/Volkswagen. With much of the compensation dependent on repair orders and warranties, a dealership needs a person with intimate knowledge of those matters to close the records at the end of the month. Collins was new in the general manager position and likely had no one else who could perform these end-of-the-month duties of the service manager. Hence, Williams's testimony that Collins asked that he stay to close the month is credible.

process would work.  Collins testified that he replied that he would finish putting the plan together and present it to him before the end of the month.

It is undisputed that on April 29, 2011, Collins prepared a pay plan for Williams and sent it by email to the regional human resources manager, Michael Mantuano.  That pay plan said, "The following is a description of the pay plan for your position as _____."  The blank space was not completed, so the position was not named or described.  At the time, Williams was working under a pay plan that provided for a $4,000 monthly salary plus commissions of 1.5% of the monthly service department gross profit, 5% of the monthly service department net profit, and 1.5% of the monthly service department customer pay gross profit, as well as three potential bonuses, based on customer-related performance markers, totaling $1,000.  The pay plan prepared for Williams on April 29, 2011, provided for a $2,000 monthly salary, plus commissions of 0.5% monthly service department gross profit, 1% of monthly service department net profit, and 0.5% of monthly service department customer pay gross profit, as well as three potential bonuses totaling $300.  Collins says that he presented this pay plan to Williams on April 29 or 30.  Williams says it was not shown to him until he went to turn in his keys on May 2, and when he asked Collins what Collins wanted him to do for this little money, Collins replied that he did not know, whereupon Williams left.  The pay plan represented a cut in Williams's pay of more than 50%.

Mantuano testified that he insisted that the pay plan be prepared before the end of the month because it is important that employees know how much they'll be making and it is necessary for the human resources department to be able to process the paychecks promptly.  No pay plan was prepared for Bell at that time, however.  Bell came to work, as noted, on May 2, 2011.  The pay plan for him was not prepared until May 5, 2011.  Bell's pay plan provided for a monthly salary of $5,000

plus commissions of 1% of monthly service department gross profit, 4% of monthly service department net profit, 1.5% of monthly service department customer pay gross profit, and three potential bonuses totaling $1,000.  In general, the pay plan prepared for Bell on May 5, 2011, represented compensation comparable to the compensation that Williams had been receiving as of April 1, 2011, though it was more heavily weighted toward salary and less toward commissions and bonuses than was Williams's plan.

On May 2, 2011, Williams turned in his keys and left North Point Mazda/Volkswagen for the last time.  On that same day, Bell became the service manager for the store, including both the Mazda and Volkswagen brands.

As noted, the testimony sharply conflicts as to whether, during the week of April 25, Collins told Williams that Williams was being terminated or that the service manager duties would be divided between the two of them.  Although the conflicting stories were told with equal fervor and conviction, the preponderance of the evidence establishes that Williams's testimony is more credible.

First, there is independent confirmation that Williams believed that he had been fired. Williams testified that after Collins fired him, he left for the day and went home to inform his wife that he had been fired from his job.[2]  On the way home, he says, he called Thomas and informed him that he had been fired.  Thomas confirmed that Williams called him and informed him that he had been fired.  Furthermore, Williams testified that on April 27 he received an email from Colanero complimenting his performance based on a report showing that the service department was performing well during the month of April.  Williams replied by email and asked if he was doing so well why had he been fired.  Williams testified that Colanero called him immediately and stated that

---

[2] Williams's wife had cancer and was on Williams's employer-based health insurance plan provided by Asbury.

he was unaware that Williams had been fired.  Colanero confirmed Williams's account of the email and the telephone call, though he testified that the email exchange and telephone conversation with Williams occurred on April 26.  In short, two different witnesses independently corroborated Williams's testimony that he believed that he had been fired.

Colanero testified that upon learning from Williams that Williams had been fired, he immediately initiated a series of telephone calls that resulted in a conversation with Dodson, who explained that Williams had not been fired but had resigned in light of Collins's plan to divide the service manager duties between Williams and Bell.  Colanero's testimony on this point conflicts with that of Collins, who said that Williams resigned on May 2, 2011.  According to Colanero, Dodson knew of Williams's resignation the week before, which is impossible if Williams did not resign until May 2.[3]  Colanero's testimony also conflicts with that of Mantuano.  According to Mantuano, Colanero called him sometime after May 2, upset that Williams had been fired without his knowledge, but he calmed down after Mantuano explained that Williams had resigned rather than being fired.  If Colanero's account is true—and the Court believes that it is—Mantuano's must be false.

Next, the plan that Collins says that he presented conflicts with the business model on which North Point Mazda/Volkswagen is based.  The purpose of having a dual franchise dealership is to achieve economies of scale.  When two different franchises will not generate enough revenue to support two dealerships in a locality, the two franchises may be combined to generate enough revenue to support a single dealership.  In this business model, the two franchises are combined into one

---

[3] Williams contends that Colanero instigated his termination.  That contention is based on Thomas's testimony that Collins told him that Colanero directed him to "make a move" on Williams.  Because Colanero was surprised to learn that Williams had been fired, he could not have directed Collins to take that action, although it is possible that Collins made that claim when he spoke to Thomas.

dealership with one general manager rather than two, one sales manager rather than two, one service manager rather than two, and one parts manager rather than two. The Asbury Automotive Group has no dual franchise with two service managers, nor did the testimony identify any dual franchise anywhere with two service managers. It is unlikely that Collins would have initiated such a significant departure from this business model within a week of being promoted to service manager without a lot of discussion among regional and perhaps national management. That discussion necessarily would have included Colanero, but the evidence shows that such discussion did not occur.

Furthermore, at the time of trial, some 30 months after Collins says he conceived the dual service manager plan, that plan still had not been implemented. If Collins believed that the use of two service managers would enhance the performance of the service department at North Point Mazda/Volkswagen, it stands to reason that he would have implemented that plan at some point. Instead, when Williams left his employment at North Point Mazda/Volkswagen, only one service manager was employed—Dewayne Bell. Bell was terminated on June 20, 2012, due to unauthorized use of property. When Bell was terminated, Collins did not employ two service managers; instead, he employed one service manager, Jonathan Manek, a trainee from the North Point Ford store, who was in his mid- to late-thirties. Manek later moved to a larger service department, and again Collins had the opportunity to implement his plan to employ two service managers, but he employed only one, a person in his thirties. Collins testified that he has never implemented the plan to employ two service managers because he has never again had the opportunity to have one service manager with technical expertise and another with excellent skills in customer relations, but that testimony is not credible. It is not credible that Williams and Bell are the only two persons who potentially could

serve as dual service managers at North Point Mazda/Volkswagen, one with technical expertise and one with excellent skills in customer relations.

The plan that Collins says he had for using two service managers would have been feasible economically only if both persons were willing to work for approximately one-half of the compensation of one full-time service manager, but it is not plausible that both Williams and Bell would have been willing to work for one-half of their then-current pay as service managers.

Furthermore, if it were true that Collins had a plan to divide the service manager position between Williams and Bell, he would have had pay plans for both of them before they began in those positions. Instead, as noted, the only pay plan prepared before May 2 was the pay plan for Williams. That pay plan proposed to reduce Williams's compensation by more than 50%, and it did not identify or describe the position that Williams was to hold, which is consistent with Williams's testimony that he asked what was he supposed to do for this little money and Collins had no answer. It is noteworthy that this pay plan was not prepared until after Colanero called Dodson to inquire as to why Williams had been fired.

In contrast, no pay plan for Bell was prepared until after Williams had left and Bell had started to work. That pay plan described Bell's position as service manager for North Point Mazda/Volkswagen, which is the position for which his job application said he was applying, and that pay plan provided for compensation comparable to what Williams made before he was terminated.[4]

_____

[4] Bell testified that he did not discuss salary with Collins before starting to work on May 2 because, he said, his motive for returning to North Point Mazda/Volkswagen was to get closer to his home in Cabot. According to Bell, he did not have to be concerned with money because his wife earns a substantial amount of money as a registered nurse. That testimony is belied by the fact that Bell's pay plan called for a greater monthly salary than Williams had been earning in the same position but with decreased commissions and bonuses. Reducing commissions and bonuses while increasing the salary evidences a concern for a more reliable income stream, less dependent on the vicissitudes of profits and customer satisfaction reports than compensation more heavily weighted toward

Another inconsistency is that Collins says that Mazda had requested to have a dedicated service manager for the Mazda brand, but, when this case was tried thirty months after Collins says he devised a plan to fulfill this request, North Point Mazda/Volkswagen still had not had a service manager dedicated exclusively to the Mazda brand (though an office was created in the service building where the service manager could spend time). Thomas testified that no one from Mazda ever told him that Mazda wanted a dedicated service manager for the Mazda brand (which Thomas knew to be impractical in any event). Likewise, Bell testified that no one from Mazda ever told him that Mazda wanted a dedicated service manager for the Mazda brand. If Mazda had made that request, Thomas, Bell, or both likely would have known about it.

Another inconsistency relates to what Collins told Bell on the morning of May 2. According to Collins, Williams resigned on May 2, stating that he was going to retire and ride his Harley. According to Bell, Collins told him that Williams was considering whether to accept the offer to work in the dual service manager role, leaving Bell with the impression that Williams might return to the dealership (though Bell thought it odd that all of Williams's belongings had been removed from the office).

As another oddity, Collins says the plan that he presented would have made Bell the service manager for the Volkswagen brand, while Williams would be the service manager for the Mazda brand. According to Thomas, 75-80% of the business was for the Volkswagen brand. Williams testified that the dealership employed five Volkswagen technicians and one Mazda technician.[5] Williams was a certified master technician for Volkswagen, had extensive experience in the

commissions and performance-based bonuses.

[5] Collins testified that there are eight or nine technicians, two or three of whom are designated Mazda.

10

Volkswagen organization, and was well-known in the Volkswagen world.  During his testimony, Thomas even referred to Williams as "Mr. Volkswagen."  Bell, in contrast, was not a certified technician and had no experience working as one.  While a service manager need not have experience as a technician, Williams had so much Volkswagen expertise and was so well known by the Volkswagen organization that it would be quite peculiar to remove him from the position of service manager of the Volkswagen brand while keeping him as the Mazda service manager.  Standing alone, this oddity would not shift the preponderance of evidence in favor of Williams as opposed to Collins on the credibility issue, but it does go into the scales along with the other evidence narrated above, leading to the conclusion that Williams has proven by the greater weight of the evidence that he was terminated.

Williams made conscientious efforts to obtain new employment.  He made inquiries at a variety of dealerships in central Arkansas, northwest Arkansas, Kansas City, and Memphis.  He eventually found employment as the service manager at Riverside Acura/Subaru in Little Rock beginning on August 29, 2011.  Williams introduced evidence to show that he had an average monthly salary during his time at North Point Mazda/Volkswagen of $6,813, which results in an annualized figure of $81,756.  During 2011, he earned $32,542 at North Point Mazda/Volkswagen and $16,022 at Riverside Acura/Subaru, resulting in lost wages of $33,192 in 2011.  In 2012, he earned $57,133 at Riverside Acura/Subaru, resulting in lost wages of $24,623.  He also seeks lost wages for 2013 in the amount of $14,867.

The defendants contend that back pay must be cut off as of December 9, 2012, and any equitable leave such as front pay or reinstatement also must be denied because on December 9, 2012, the defendants learned that Williams had taken confidential documents in violation of company policy

when he left.  Those documents include names of North Point Mazda/Volkswagen customers, along with evaluations by those customers of their experience at the North Point Mazda/Volkswagen service department, management reports relating to customer satisfaction of the North Point Mazda/Volkswagen service department, and financial data for the parts and service departments at a large number of Asbury Automotive Group's dealerships.  Williams says that he printed some of the documents from Volkswagen's website, but he also said that only store employees have access to the website.  Williams violated company policy when he took these documents.  Mantuano testified that the company would terminate any employee who violated company policy by taking such confidential documents, and the Court accepts that testimony as true.

It is unlawful for an employer to discharge an individual because of the individual's age. 29 U.S.C. § 623(a)(1).  In the absence of direct evidence, a plaintiff may prove age discrimination using the *McDonnell-Douglas* burden-shifting framework.  *Rahlf v. Mo-Tech Corp., Inc.*, 642 F.3d 633, 637 (8th Cir. 2011).  This framework imposes a burden on the plaintiff to establish a prima facie case of age discrimination.  *Id*.  To establish a prima facie case, the plaintiff must show that (1) he was at least forty years of age, (2) he suffered an adverse employment action, (3) he was meeting his employer's legitimate expectations at the time of the adverse employment action, and (4) he was replaced by someone substantially younger.  *Holmes v. Trinity Health*, 729 F.3d 817, 822 (8th Cir. 2013).

Williams established a prima case.  First, he was sixty-three years old when he was terminated. Second, he was terminated, which obviously is an adverse employment action.[6]  Third, he was

---

[6] Even on Collins's account, Williams was constructively discharged.  Constructive discharge occurs when an employee is reassigned to a new position that a reasonable person in his position would find demeaning and intolerable.  *Sanders v. Lee Cnty. Sch. Dist. No. 1*, 669 F.3d 888, 894 (8th Cir. 2012).  *Cf. Fisher v. Pharmacia & Upjohn*, 225 F.3d 915, 919 (8th Cir. 2000) ("A transfer

meeting his employer's legitimate expectations at the time he was discharged.  Although Collins

testified that the service department had been stagnant for several years, he also testified that he did

not blame Williams for that fact.  Thomas, who supervised Williams from April 1, 2010, until April

14, 2011, testified that Williams did an excellent job as service manager.  No witness criticized

Williams's job performance.  Finally, Williams was replaced by a substantially younger individual.

Bell was born on January 28, 1968, so he was more than twenty years younger than Williams when

he replaced Williams as service manager.  In addition, Collins hired two more service managers after

Bell, both of whom were in their thirties.

 Because Williams established a prima facie case, the burden of production shifts to the

employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action.

*Rahlf*, 642 F.3d at 637.  The defendants, of course, deny that Williams was terminated, so they have

not articulated a legitimate, nondiscriminatory reason for doing so.  They have, however, articulated

a legitimate, nondiscriminatory reason for a change in Williams's employment status from service

manager for the entire North Point Mazda/Volkswagen store to service manager only for the Mazda

brand.  As noted, that change in employment status entailed a significant reduction in responsibility

and compensation, exceeding 50%, so even accepting the defendants' version of the facts, Williams

---

constitutes an adverse employment action when the transfer results in a significant change in working
conditions or a diminution in the transferred employee's title, salary, or benefits.")  Moving Williams
from service manager over the entire service department to service manager for 20-25% of the
business and cutting his compensation by greater than 50% would constitute a constructive discharge.
The defendants contend that Williams did not exhaust his administrative remedies because he did not
allege constructive discharge in his EEOC charge.  Even if an allegation is not listed in the EEOC
charge, a plaintiff has exhausted his administrative remedies if the allegation is reasonably related to
the substance of the allegations stated in the charge.  *Williams v. Little Rock Mun. Waterworks*, 21
F.3d 318, 322 (8th Cir. 1994).  Here, Williams's allegations are reasonably related to the allegations
in the EEOC charge as evidenced by the fact that the defendants argued in response to his EEOC
charge that he was not constructively discharged.  Pl. Exh. 2 at 4.

was constructively discharged.  Accepting the proposition that Collins's explanation for this action constitutes a legitimate, nondiscriminatory reason, the burden shifts to Williams to show that the reason was a pretext for discrimination.  *Id*.  "At all times, the plaintiff retains the burden of persuasion to prove that age was the 'but-for' cause of the termination."  *Id*.

For reasons explained above, the defendants' explanation as to how and why Williams was separated from his employment at North Point Mazda/Volkswagen is unworthy of credence.  More simply, the explanation is contrived.  That the explanation is contrived permits but does not require the trier of fact to infer that the adverse employment action was motivated by discrimination, because it is not enough to disbelieve the employer; rather, the factfinder must believe the employee's explanation of intentional discrimination.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147, 120 S. Ct. 2097, 2108, 147 L. Ed. 2d 105 (2000).

> In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as affirmative evidence of guilt.  Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision.

*Id*. (quotation marks and citations omitted).  Inferring discrimination from the falsity of an employer's explanation is not appropriate in certain circumstances: if, for instance, "the record conclusively reveal[s] some other, nondiscriminatory reason for the employer's decision, or if the plaintiff create[s] only a weak issue of fact as to whether the employer's reason [is] untrue and there [is] abundant and uncontroverted independent evidence that no discrimination [has] occurred."  *Id*. at 148, 120 S. Ct. at 2109.

Here, as discussed, the evidence is strong that Collins's articulated reason for terminating Williams is contrived.  Further, the evidence does not suggest that the defendants contrived this reason to hide something other than discrimination.  And no evidence exists to counteract the inference that the defendants contrived the reason to hide age discrimination. *Cf. id.* ("[W]hen all legitimate reasons for rejecting an applicant have been eliminated as possible reasons for the employer's actions, it is more likely than not the employer, who we generally assume acts with *some* reason, based his decision on an impermissible consideration." (quoting *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577, 98 S. Ct. 2943, 57 L. Ed. 2d 957 (1978) (alteration in original))).  This is not, for instance, a case in which North Point Mazda/Volkswagen hired other people in the protected class to perform similar jobs, which in some instances may tip the scales away from an inference of discrimination. *See, e.g.*, *Owens v. Crop Prod. Servs., Inc.*, No. 2:12CV00027 JLH, slip op. at 8 (E.D. Ark. Apr. 23, 2013) (Document #32).  Instead, Williams was replaced by someone more than twenty years younger than he.  The two service managers hired at North Point Mazda/Volkswagen after Bell were even younger than Bell.  Given the strength of the evidence that Collins's articulated reason for terminating Williams is contrived, coupled with North Point Mazda/Volkswagen's hiring of substantially younger employees (and no hiring of service managers or other employees near Williams's age), age discrimination is the most likely explanation for Williams's termination.

Williams has attempted to buttress his case with evidence that Colanero and Dodson held age-related stereotypes against him, arguing that Colanero and Dodson directed Collins to take the action that he did.  Thomas testified, for instance, that Collins had told him that Colanero had instructed Collins to make a move on Williams.  The evidence does not show, however, that Colanero directed

15

Collins to take the action against Williams that he did.  As discussed and credited, Colanero was

surprised to learn that Williams had been terminated when Williams told him.  The evidence instead

suggests that Collins terminated Williams on his own or at the behest of Dodson.[7]  The evidence does

not show that Collins or Dodson made specific age-related comments regarding Williams, but such

lack of direct evidence of discrimination does not alter the conclusion that age discrimination is the

most likely explanation for Williams's termination.  *Cf. Doherty v. Crow*, No. TH-99-216-C-T/H,

2011 WL 722090, at *16 (S.D. Ind. Apr. 20, 2001) (finding age discrimination against a service

writer at a Harley Davidson store although there was "no evidence of age-based comments made by

anyone involved in the decision to discharge [the employee] and the evidence show[ed] that [the

Harley Davidson store] hired employees in the protected age class"); *see also Reeves*, 530 U.S. at

141, 120 S. Ct. at 2105 ("[T]here will seldom be 'eyewitness' testimony as to the employer's mental

processes." (quoting *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716, 103 S. Ct.

1478, 75 L. Ed. 2d 403 (1983))).

The parties dispute the amount of damages Williams should recover.  Williams requests back

pay and equitable relief in the form of front pay.  As discussed, the defendants contend that Williams's

---

[7] The main evidence that Dodson may have been involved in the decision is Williams's
testimony that when Collins terminated him, Collins told Williams that Dodson was forcing him to
do it.  Further, Dodson was Collins's direct supervisor.  Dodson offered Collins the position of North
Point Mazda/Volkswagen's general manager in person on April 14, 2011.  At that meeting, according
to Collins, Dodson discussed his expectations with Collins.  Specifically, he discussed his expectations
regarding North Point Mazda/Volkwagen's service department.  Collins testified that he would
typically speak to Dodson, not Colanero, and that he had conversations with Dodson between April
14 and April 18 of 2011.  On April 18, Bell submitted an application to be North Point
Mazda/Volkswagen's service manager.  On April 26, Collins terminated Williams.  By the time
Colanero talked to Dodson on April 26 or 27 about Williams's termination or constructive discharge,
Dodson already knew that Williams's employment at North Point Mazda/Volkswagen was
concluding.  While possible, the notion that Collins would make such an important personnel decision
on his own, within a week or two of being promoted to general manager by Dodson and without
Dodson's approval or direction, seems unlikely.

16

back pay should be cut off as of December 9, 2012, and that front pay should be denied because Williams took confidential documents in violation of company policy.  When an employee is discharged in violation of the Age Discrimination in Employment Act and the employer later discovers wrongful conduct that would have led to the employee's lawful discharge had it been discovered during employment, front pay is not an appropriate remedy and back pay is limited to the date the new information was discovered. *McKennon v. Nashville Banner Publ'g Co.*, 513 U.S. 352, 361-63, 115 S. Ct. 879, 886-87, 130 L. Ed. 2d 852 (1995).  Williams took confidential documents in violation of company policy, and the Court has credited Mantuano's testimony that the company would terminate any employee who violated company policy by taking such confidential documents. Therefore, Williams's back pay will be limited to the time period through December 9, 2012, and Williams will not receive front pay.

Once unlawful discrimination is found, back pay should be awarded to further "the ADEA's goal to 'make whole' persons who suffer loss due to discrimination." *Coleman v. City of Omaha*, 714 F.2d 804, 808 (8th Cir. 1983).  "Back pay in an age discrimination case is the difference between the value of the compensation the plaintiff would have been entitled to had he remained employed by the defendant and whatever wages he earned during the relevant period." *Hartley v. Dillard's, Inc.*, 310 F.3d 1054, 1062 (8th Cir. 2002).  Back pay includes commission-based income, and a fact-finder may use an employee's last year of commission salary to estimate the employee's lost earnings. *See Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 145, 156 (3d Cir. 1999); *Gilchrist v. Jim Slemons Imports, Inc.*, 803 F.2d 1488, 1501 (9th Cir. 1986).  Williams has provided documentation showing that his average monthly salary, including commissions, during his employment at North Point Mazda/Volkswagen was $6,813.  Using this monthly average, Williams contends that he would have

made $81,756 if he had remained at North Point Mazda/Volkswagen for all of 2011. The defendants do not argue that this is an unreasonable estimate of the amount that Williams would have earned had he remained as the service manager at North Point Mazda/Volkswagen. Williams requests lost wages for 2011 in the amount of $33,192 (his expected yearly earnings less $32,542 that he earned at North Point Mazda/Volkswagen and $16,022 that he earned at Riverside Acura/Subaru). He also requests back pay for $2,580 in COBRA payments he made during six months in which he did not have employee-based health insurance, less what he would have contributed if he had his employee-based insurance at North Point Mazda/Volkswagen. *Cf. Hance v. Norfolk S. Ry. Co.*, 571 F.3d 511, 522 (8th Cir. 2009); *Tolan v. Levi Strauss & Co.*, 867 F.2d 467, 470 (8th Cir. 1989). The defendants do not take issue with these figures. Williams requests lost wages for 2012 in the amount of $24,623, but this number does not reflect that his back pay in this action cuts off after December 9. The Court reduces his back pay for 2012 to $23,138.78.[8] Because Williams's back pay cuts off after December 9, 2012, he will not receive back pay for 2013. Therefore, the Court awards Williams back pay in the amount of $58,910.78.

Williams also requests liquidated damages. If an employer willfully violates the ADEA, the plaintiff is entitled to liquidated damages in an amount equal to the actual damages awarded. 29 U.S.C. § 626(b). "An employer willfully violates the ADEA when it 'knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute.'" *Christensen v. Titan Distribution, Inc.*, 481 F.3d 1085, 1097 (8th Cir. 2007) (quoting *Spencer v. Stuart Hall Co.*, 173 F.3d 1124, 1129 (8th Cir. 1999)). "A plaintiff can prove willfulness by using the same evidence it

---

[8] The Court calculates this total by determining what Williams's average daily salary at North Point Mazda/Volkswagen would have been, $223.99, and what his average daily salary at Riverside was in 2012, $156.53, and calculating the difference between the two salaries for 343 days of work.

used to prove an ADEA violation . . . ."  *Id.*  Here, Williams presented evidence that Williams's bosses knew that age discrimination was against the law.  They attended employment law seminars and the information was detailed in Asbury's Code of Business Conduct and Ethics for Directors, Officers and Employees.  The knowledge that age discrimination was against the law, coupled with the previously discussed strong evidence showing that the defendants contrived a reason for terminating Williams in an effort to mask age discrimination, compels the conclusion that the decision to discriminate against Williams because of his age was done willfully.  *Cf. id.* at 1097-98.  This is not an action in which the defendants "incorrectly but in good faith and nonrecklessly believe[d] that the statute permit[ted] a particular age-based decision."  *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 616, 113 S. Ct. 1701, 1709, 123 L. Ed. 2d 338 (1993).  Therefore, the Court awards Williams liquidated damages in the amount of $58,910.78.  *Cf. Spencer*, 173 F.3d at 1129-30 (allowing liquidated damages even though the evidence supporting liability was "thin"); *Maschka v. Genuine Parts Co.*, 122 F.3d 566, 572 (8th Cir. 1997) ("There was evidence, principally from a GPC employee manual that described its policies against discrimination, that GPC knew it could not generally make adverse employment decisions on the basis of age.  GPC presented no evidence that it made its decision under the erroneous belief that it was entitled to an exception to the provisions of the ADEA.  Consequently, there was sufficient evidence from which a jury could conclude that the violation was willful, and thus the District Court's award of liquidated damages was proper.").

Williams also requests prejudgment interest.  "[T]o prevent double recovery, successful plaintiffs are not entitled under the ADEA . . . to obtain both liquidated damages and prejudgment interest absent exceptional circumstances."  *Gibson v. Mohawk Rubber Co.*, 695 F.2d 1093, 1102

(8th Cir. 1982).   Since Williams obtained liquidated damages, he will not receive prejudgment interest.

Finally, the defendants argue that Asbury Automotive Group, Inc., should be dismissed as a defendant because it is a holding company that was not Williams's employer.   The ADEA prohibits an employer from discriminating against an employee on the basis of age.   29 U.S.C. § 623(a). Williams argues that Asbury Automotive Group, Inc., and North Point Mazda/Volkswagen are so integrated as to be considered a single employer.   A strong presumption exists that a parent company is not the employer of its subsidiary's employees.   *Brown v. Fred's, Inc.*, 494 F.3d 736, 739 (8th Cir. 2007).   "A parent company may employ its subsidiary's employees if (a) the parent company so dominates the subsidiary's operations that the two are one entity and therefore one employer, or (b) the parent company is linked to the alleged discriminatory action because it controls individual employment decisions."   *Id.* (citation and quotation marks omitted).   Courts look to four factors to determine whether a parent company so dominates the subsidiary's operations that the two are a single employer: (1) interrelation of operations; (2) common management; (3) centralized control of labor relations; and (4) common ownership or financial control, of the employer and the corporation. *Sandoval v. Am. Bldg. Maint. Indus., Inc.*, 578 F.3d 787, 794, 796 (8th Cir. 2009).   While the evidence indicates that North Point Mazda/Volkswagen was part of the Asbury Automotive Group, Inc., umbrella and that Asbury Automotive Group, Inc., gave some direction to North Point Mazda/Volkswagen, *see* Pl. Exh. 5, 27, Asbury Automotive Group, Inc., was a holding company with no employees and limited operations.   *See* Document #18-1 at 1.   As such, Asbury Automotive Group, Inc., was not in a position to dominate North Point Mazda/Volkswagen's operations or to control individual employment decisions.   Asbury Automotive Group, LLC, and North Point

20

Mazda/Volkswagen might be so interrelated that the two constitute a single employer, but Asbury Automotive Group, LLC, is not a defendant.  Asbury Automotive Group, Inc., is not an employer under the ADEA and is dismissed as a defendant.

## CONCLUSION

North Point Mazda/Volkswagen violated the ADEA by discriminating against Williams on the basis of his age.  The Court awards Williams damages in the amount of $117,821.56.  A judgment will be entered separately.

IT IS SO ORDERED this 7th day of February, 2014.

_____
J. LEON HOLMES
UNITED STATES DISTRICT JUDGE